**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| MIHAJLO RISTIC, individually, and on behalf of all others similarly situated, | Case No.  15-cv-08996 |
| *Plaintiff*, | |
| *v.* | |
| MACHINE ZONE, INC., a Delaware corporation, | |
| *Defendant*. | |

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Mihajlo Ristic brings this Class Action Complaint against Defendant Machine Zone, Inc. ("Machine Zone" or "Defendant") to recover gambling losses and damages incurred through the operation of its electronic casino. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and upon information and belief, including investigation conducted by his attorneys, as to all other matters.

**NATURE OF ACTION**

1.     Defendant Machine Zone operates the popular Game of War videogame, which is available on Android and Apple iOS smartphones and tablets. Players download the game onto their smartphones and tablets, create virtual towns and armies, and battle other Game of War players.

2.     While the game is free to play, Machine Zone sells "Gold" and "Chips" within the game, starting at the price of $4.99 for 1,200 Gold. While players can use Gold to improve their virtual towns and hasten their advancement in the game, these benign uses of Gold merely obfuscate the unlawful game of chance Machine Zone operates within Game of War. In this

game of chance—appropriately named the "Casino"—players routinely wager hundreds of dollars for the chance of winning valuable prizes.

3. Players that win the most valuable prizes can then "cash out" by listing their Game of War accounts on the secondary market, with the cash value of accounts rising commensurate with the value of awarded prizes. Game of War accounts listed at online auction sites regularly sell for hundreds of dollars.

4. Unfortunately, thousands of consumers across the Illinois have lost—and Defendant has won—millions of dollars through Defendant's Game of War Casino. Accordingly, Mihajlo Ristic, on his own behalf and on behalf of a class of similarly situated individuals, brings this lawsuit to recover the ill-gotten gains, damages, and losses, where applicable, as well as costs and attorneys' fees.

## PARTIES

5. Plaintiff Mihajlo Ristic is a natural person and citizen of the State of Illinois.

6. Defendant Machine Zone, Inc. is a corporation existing under the laws of the State of Delaware, with its principal place of business located at 555 Hamilton Avenue, Palo Alto, California 94301. Machine Zone conducts business in this District, the State of Illinois, and nationwide.

## JURISDICTION AND VENUE

7. Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the class is a citizen of a state different from Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under that subsection apply to this action.

8. The Court has personal jurisdiction over Defendant because Defendant conducts

significant business transactions in this District, and because the wrongful conduct occurred in and emanated from this District.

9.      Venue is proper because Defendant conducts business transactions in this District, the causes of action at issue arose in substantial part in this District, and Plaintiff resides in this District.

## COMMON FACTUAL ALLEGATIONS

### I.      Free-to-Play and the New Era of Gambling.

10.      The proliferation of internet-connected smartphones and tablets has led to the growth of so-called "free-to-play" videogames. With free-to-play games, developers encourage consumers to download and play games for free while selling many low-cost items within the game itself. Developers aim to recoup their costs (and make a profit) by selling thousands of "in-game" items that start at $0.99 (purchases known as "micro-transactions") instead of charging an up-front fee.

11.      The free-to-play model has become particularly attractive to developers of games of chance (*e.g.*, poker, blackjack, and slot machine mobile videogames, among others) because it allows them to generate huge profits. In 2012, free-to-play games of chance generated over $1.6 billion in worldwide revenue and are expected to grow to over $2.4 billion by the end of 2015.[1] Even "large land-based casino operators are looking at this new space" for "a healthy growth potential."[2]

12.      With free-to-play games of chance, developers have begun exploiting the same

---

[1]      VentureBeat, *Report confirms that social casino games have hit the jackpot with $1.6B in revenue | GamesBeat | Games | by Dean Takahashi*, http://venturebeat.com/2012/09/11/report-confirms-that-social-casino-games-have-hit-the-jackpot-with-1-6b-in-revenue/ (last visited Oct. 9, 2015).

[2]      *Id.*

psychological triggers as casino operators. As one respected videogame publication put it:

> "If you hand someone a closed box full of promised goodies, many will happily pay you for the crowbar to crack it open. The tremendous power of small random packs of goodies has long been known to the creators of physical collectible card games and companies that made football stickers a decade ago. For some . . . the allure of a closed box full of goodies is too powerful to resist. Whatever the worth of the randomised [sic] prizes inside, the offer of a free chest and the option to buy a key will make a small fortune out of these personalities. For those that like to gamble, these crates often offer a small chance of an ultra-rare item."[3]

13.    Another stated:

> "Games may influence 'feelings of pleasure and reward,' but this is an addiction to the games themselves; micro-transactions play to a different kind of addiction that has existed long before video games existed, more specifically, an addiction similar to that which you could develop in casinos and betting shops."[4]

14.    The comparison to casinos doesn't end there. Just as with casino operators, free-to-play developers rely on a small portion of their players to provide the majority of their profits. These "whales," as they're known in casino parlance, account for just "0.15% of players" but provide "over 50% of mobile game revenue."[5]

15.    Game Informer, another respected videogame magazine, reported on the rise (and danger) of micro-transactions in free-to-play games and concluded:

> "[M]any new mobile and social titles target small, susceptible populations for large percentages of their revenue. If ninety-five people all play a [free-to-play] game without spending money, but five people each pour $100 or more in to obtain virtual currency, the designer can break even. These five individuals are what the industry calls whales, and we tend not to be too concerned with how they're being used in the equation. While the scale and potential financial ruin is of a different magnitude, a similar profitability model governs casino gambling."[6]

---

[3]    PC Gamer, *Microtransactions: the good, the bad and the ugly*, www.pcgamer.com/microtransactions-the-good-the-bad-and-the-ugly/ (last visited Oct. 9, 2015).

[4]    The Badger, *Are micro-transactions ruining video games? | The Badger*, www.badgeronline.co.uk/micro-transactions-ruining-video-games/ (last visited Oct. 9, 2015).

[5]    *Id.* (emphasis added).

[6]    Game Informer, *How Microtransactions Are Bad For Gaming - Features - www.GameInformer.com*, www.gameinformer.com/b/features/archive/2012/09/12/how-microtransactions-are-bad-for-gaming.aspx (last visited Oct. 9, 2015).

16.     Academics have also studied the socioeconomic effect free-to-play games have on

consumers. In one study, the authors compiled several sources analyzing free-to-play games of

chance (called "casino" games below) and stated that:

> "[Researchers] found that [free-to-play] casino gamers share many similar
> sociodemographic characteristics (*e.g.*, employment, education, income) with
> online gamblers. Given these similarities, it is perhaps not surprising that a strong
> predictor of online gambling is engagement in [free-to-play] casino games.
> Putting a dark line under these findings, over half (58.3%) of disordered gamblers
> who were seeking treatment stated that social casino games were their first
> experiences with gambling."
> . . .
> "According to [another study], the purchase of virtual credits or virtual items
> makes the activity of [free-to-play] casino gaming more similar to gambling.
> Thus, micro-transactions may be a crucial predictor in the migration to online
> gambling, as these players have now crossed a line by paying to engage in these
> activities. Although, [sic] only 1–5% of [free-to-play] casino gamers make micro-
> transactions, those who purchase virtual credits spend an average of $78. Despite
> the limited numbers of social casino gamers purchasing virtual credits, revenues
> from micro-transactions account for 60 % [sic] of all [free-to-play] casino gaming
> revenue. Thus, a significant amount of revenue is based on players' desire to
> purchase virtual credits above and beyond what is provided to the player in seed
> credits."[7]

17.     The same authors looked at the link between playing free-to-play games of chance

and gambling in casinos. They stated that "[prior] research indicated that winning large sums of

virtual credits on social casino gaming sites was a key reason for [consumers'] migration to

online gambling," yet the largest predictor that a consumer will transition to online gambling was

"micro-transaction engagement." In fact, "the odds of migration to online gambling were

approximately *eight times greater* among people who made micro-transactions on [free-to-play]

---

[7]     Hyoun S. Kim, Michael J. A. Wohl, *et al.*, *Do Social Casino Gamers Migrate to Online
Gambling? An Assessment of Migration Rate and Potential Predictors*, Journal of gambling
studies / co-sponsored by the National Council on Problem Gambling and Institute for the Study
of Gambling and Commercial Gaming (Nov. 14, 2014), *available at*
http://link.springer.com/content/pdf/10.1007%2Fs10899-014-9511-0.pdf (citations omitted).

casino games compared to [free-to-play] casino gamers who did not make micro-transactions."[8]

18.     The similarity between free-to-play games of chance and games of chance found in casinos has caused governments across the world to intervene and limit their availability.[9] For example, a member of the Belgian Gaming Commission recently decried Game of War's Casino as illegal gambling, stating that Machine Zone was targeting underage consumers and encouraging them to gamble due to the "casino elements" within the game.[10] Unfortunately, such games have eluded regulation in the United States. As a result, and as described below, Defendant's Game of War Casino has thrived and thousands of consumers have lost millions of dollars by unwittingly gambling in Defendant's unlawful game of chance.

## II.     Defendant's Game of War and its Virtual Casino.

19.     Machine Zone operates the popular Game of War videogame that is available on Android (*e.g.*, Samsung Galaxy S) and iOS (*e.g.*, Apple iPhone) smartphones and tablets. Consumers download the game for free by visiting the Google Play or the Apple App store. Once the game is installed, consumers begin playing by opening the game and running through a tutorial created by Machine Zone aimed to familiarize consumers with the game's mechanics.

20.     Although the game is free-to-play, one of the primary methods by which Defendant generates revenue is selling in-game "Gold" to consumers. Prices start at $4.99 for

---

[8]     *Id.* (emphasis added).

[9]     In late August 2014, South Korea began regulating "social gambling" games, including games similar to Game of War, by "ban[ning] all financial transactions directed" to the games. PokerNews.com, *Korea Shuts Down All Facebook Games In Attempt To Regulate Social Gambling | PokerNews*, www.pokernews.com/news/2014/09/korea-shuts-down-facebook-games-19204.htm (last visited Oct. 9, 2015). Similarly, "the Maltese Lotteries and Gambling Authority (LGA) invited the national Parliament to regulate all digital games with prizes by the end of 2014." *Id.*

[10]     *Belgian Regulator Denounces Game of War: Fire Age as "Illegal Gambling"*, www.casino.org/news/belgian-regulator-denounces-game-war-fire-age-illegal-gambling (last visited Oct. 9, 2015).

1,200 Gold. Since early 2014, Machine Zone has generated over $600 million in revenue, in large part, by selling Gold and Chips.

21. Once consumers purchase Gold, they are able to buy "Chips" at the game's "Casino." Defendant's aptly named Casino, though, is nothing more than an illegal game of chance camouflaged as a benign videogame.

   *A.    Defendant's Game of War Casino and its Spinning Wheel of Chance.*

22. Within Game of War, Machine Zone has created a virtual Casino where the only purpose is to engage in a game of chance. The first time consumers visit the Casino, Defendant gives them a free "spin" of the wheel. (*See* Figure 1.)



(**Figure 1.**)

23. After their initial visit, consumers have to wager a minimum of 5,000 Chips for each spin. (*See* Figure 2, on the following page.) If consumers do not have enough Chips to spin the Wheel, Machine Zone informs them that they must "Get & Use" Chips by buying them for 200 Gold. (*Id.*) Defendant then directs consumers to its "Gold Store to purchase more" via a pop-up screen. (*Id.*)

 

(**Figure 2.**)

24.     At its Gold Store, Defendant sells Gold at prices starting at $4.99 for 1,200 Gold

and at a maximum of $99.99 for 20,000 Gold. (*See* Figures 3 and 4.)

 

(**Figure 3.**)          (**Figure 4.**)

25.     Once the consumers have purchased the Gold[11], they can return to the Casino to

exchange their Gold for Chips to use at Defendant's game of chance.

---

[11]     In an effort to boost sales of Chips and Gold (and without disclosing this fact), Defendant only lets players purchase packages at prices equal to or higher than price of the previous package the consumer purchased. For example, if a consumer purchased packages at $4.99, then $4.99, and then $9.99, Defendant won't offer that consumer any packages less than $9.99 going forward.

26.     Defendant's Casino is not unlike the popular spinning wheel games found at traditional casinos (*e.g.*, "Big Six Wheel" or "Wheel of Fortune"). For its version of the spinning wheel, Defendant encourages consumers to "PLAY" by wagering 5,000 Chips (approximately $0.60) to spin the wheel. (*See* Figure 5, showing the cost of one "PLAY" or spin as "5,000" Chips, or $0.60). Defendant also developed a "HIGH ROLLER MODE" that can be activated (at a price) to increase the wager while making "bonus items" available as prizes.

 

(**Figure 5.**)                              (**Figure 6.**)

27.     When the consumer spins the wheel, Defendant uses an animated light to indicate a "spin." The animated light then rotates around the wheel and stops after several seconds. The consumer is awarded whatever prize the animated light lands on. (*See* Figure 6, showing that the player won "10,000" additional casino chips, worth approximately $1.20.)

28.     The prizes Defendant awards vary in value from "resources" that can be used to advance game play, such as "food," "wood," or "stone," (which are worth less than the initial wager)[12] to high-value items such as additional Casino Chips or Gold (which are worth more

---

[12]     Defendant sells the same resources that are awarded as prizes in its "Items" store. Therein, players can exchange Gold (which was purchased for cash) for a bundle of resources.

than the initial wager).

29.     Similar to traditional spinning wheels found in casinos, consumers do not have any ability to control what prizes Defendant awards upon a spin.[13] After pressing the button to spin the wheel, Defendant does not accept any input or action until it awards the prize—no skill on the part of the consumer affects the outcome of a spin. In fact, while other segments of the Game of War videogame do require a certain level of skill, the Casino is a separate and unnecessary component found within the game—not unlike a slot machine found in a billiards hall. That is, the existence and proximity of games of skill do not cure the gambling nature of games of chance. Moreover, should Machine Zone stop operating the Casino, the remaining portions of the Game of War videogame would continue on without consequence.

30.     The outcome of a spin depends entirely on the rules Defendant has programmed into the Game of War Casino. Defendant programmed the rules that determine, for example, how much consumers can wager, how the wagers are deducted from accounts, how long each spin takes, how the spin is animated, the odds of winning each type of prize, and how the prize is presented and credited to the consumer. Moreover, Defendant maintains detailed records showing transaction details, such as when players purchase Gold and/or convert Gold to Chips.

C.     *Consumers Have Lost (and Defendant Has Won) Real Money in the Casino.*

31.     The Casino is an integral part of Defendant's Game of War. Defendant advertises

---

As such, it is possible to calculate that the Casino's low-value awards have a value as little as $0.04 for the "7,500 food" shown in <u>Figure 5</u>. Likewise, the high-value awards, such as a 4,000 Gold, is worth approximately $16.

[13]     While the consumer does not have a choice as to the specific prize they are awarded by the spinning wheel, there are instances where Defendant's prize is a play at another game of chance. In those cases, for example, Defendant will present three closed "treasure chests" to the consumer that contain (hidden) items of varying value. The consumer is allowed to open one chest to discover and keep whatever it contains. Like the spinning wheel, the contents of the chests range from in-game resources to additional Chips or Gold.

the Casino to consumers within the game and has tied usage of the Casino to in-game advancement. By design, all players of Game of War have undoubtedly spun the wheel at the Casino. And once Defendant has gotten a consumer's foot in the Casino door, Defendant does its best to encourage consumers to wager Chips that have been purchased with cash.

32.     In one report, a child who played Game of War lost over €25,000 (approximately $27,000) of his parents' money by playing Game of War and wagering at the Casino.[14]

33.     The allure of the Casino, naturally, is that consumers have the chance of winning prizes that are valued higher than their initial wagers. Knowing this, Defendant populated the possible outcomes with prizes such as Chips that grant additional spins of the wheel and "treasure chests" that might be filled with Gold.

34.     Recently, in an effort to uncover the odds of winning various prizes, an individual that regularly plays in the Casino compiled the results of over 1,000 individual spins. These results, shown in Figure 7, shed light on the odds Defendant programmed each spin to win each prize.

|  | Spins | Basic Items | Chests | Chests With Gold | Free Chips |
|---|---|---|---|---|---|
| Total Spins | 1098 | 843 | 178 | 47 | 77 |
| Total Percent | 100% | 76.78% | 16.21% | 26.40% | 7.01% |

(**Figure 7.**)[15]

35.     The results also show consumers' expected cost of obtaining each prize, which is also equal to Defendant's expected revenue by offering each prize. (*See* Figure 8.)

---

[14]     *Belgian Regulator Denounces Game of War: Fire Age as "Illegal Gambling"*, *supra*.
[15]     *What are the odd's - Casino | GOWFA Central*, www.gowfacentral.com/what-are-the-odds-casino/ (last visited Oct. 9, 2015).

| | Basic Item | Chests | Chests With Gold | Free Chips |
|---|---|---|---|---|
| Expected Cost | $0.77 | $4.95 | $13.78 | $8.41 |

(**Figure 8.**)[16]

36.     As the figures above show, Defendant programmed the odds to favor the award of "basic items" on a spin while disfavoring the award of chests, Gold, and Chips. Nevertheless, Defendant risks paying out more than the cost of a spin each time that a player pays for spin. Yet, Defendant programmed the odds in that way because it knows that consumers will pay a little money up front for the *chance* at receiving an otherwise expensive item. By design, then, Defendant has made millions selling Chips and Gold that are used to wager at its Casino.

　　　　*D.*　　*The Secondary Market for Game of War Accounts.*

37.     The prizes Defendant awards after spinning are valuable to Machine Zone and players alike. Machine Zone makes millions of dollars by selling Gold and Chips to consumers within the Game of War videogame, and to cash out, players have created secondary markets to buy and sell Game of War accounts.

38.     Specifically, when players win big at the Casino, they can cash out by selling their accounts online. For example, Game of War accounts are regularly listed for sale on traditional auction websites, such as nonparty eBay, Inc., for $500 or more. Accounts containing a high amount of Gold and Chips fetch higher prices.[17]

39.     Similarly, players routinely list accounts for sale at PlayerAuctions.com where the prices rise commensurate with the amount of Gold in the account, with some listed for $3,000

---

[16]     Expected cost was calculated by multiplying the approximate cost per spin of $0.60 by the odds of winning identified in Figure 7.

[17]     *Game of war accounts | eBay*, www.ebay.com/sch/i.html?_from=R40&_trksid= p2050601.m570.l1313.TR0.TRC0.H0.Xgame+of+war+accounts.TRS0&_nkw=game+of+war+a ccounts&ghostText=&_sacat=0 (last visited Oct. 9, 2015).

and more.[18] As such, players' account values will increase with the amount of Gold that is won through Defendant's Casino.

40.      Thousands of players have also joined together to create a Facebook community that is self-described as the "Largest Game of War Account Trading Community on Facebook. Here you can Buy, Sell, and Trade GoW Accounts."[19]

41.      And on www.PlayerUp.com—the "worlds [*sic*] most secure player 2 player account marketplace"—over 5,070 users have listed their Game of War accounts for sale. (*See* Figure 9.) Many of the consumers selling accounts have asked prices well over $1,000. (*See id.*)



(**Figure 9.**)

42.      Defendant is and was fully aware of the existence of this secondary market and the manner in which its customers use it.

---

[18]    *Buy Game of War Account with Mil power and lot more offer! | PlayerAuctions*, www.playerauctions.com/game-of-war-account/ (last visited Oct. 9, 2015).
[19]    *Game of War Accounts - Buy and Sell | Facebook*, www.facebook.com/gameofwaraccounts (last visited Oct. 9, 2015).

## PLAINTIFF RISTIC'S EXPERIENCE

43.     In early 2014, Plaintiff Ristic downloaded Game of War onto his smartphone and began playing the game. Soon after, he began playing in the Casino where he wagered complimentary Chips for a chance to win a prize.

44.     After he exhausted his complimentary Chips, Plaintiff Ristic began purchasing more Chips by buying Gold in increments of at least $4.99. Thereafter, Plaintiff Ristic continued to purchase Chips and Gold so that he could wager Chips for a chance at winning prizes in Defendant's Casino.

45.     In total, between April 9, 2015 and October 9, 2015 Plaintiff has lost more than $50 wagering at Defendant's Casino, likely exceeding $500.[20]

46.     Moreover, since Plaintiff began playing Game of War, he has spent thousands of dollars purchasing in-game items (*e.g.*, Gold, Chips, power-ups, and resources) that he would not have purchased had he known that Defendant was operating and profiting from an unlawful game of chance.

## CLASS ALLEGATIONS

47.     **Class Definitions:** Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of himself and a Class defined as follows:

<u>Class</u>: All persons domiciled in the State of Illinois who purchased Chips from Defendant and lost $50 or more gambling at Defendant's Game of War Casino.

The following persons are excluded from the Class: (1) any Judge or Magistrate presiding

---

[20]     While it is clear that Plaintiff lost more than $50 during this time and likely more than $500, Plaintiff is unable to determine the exact amount lost on each date due to the mechanics of the Casino and the information available through the application. *See* redacted statement of purchases attached hereto as Exhibit A, showing "Game of War – Fire Age" purchases exceeding $500 on August 17, 2015. Defendant maintains all records necessary to determine the dates and amounts lost with specificity.

over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

48. **Numerosity:** On information and belief, tens of thousands of consumers fall into the Class definition. Members of Class can be identified through Defendant's records.

49. **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the members of the Class, and he has retained counsel competent and experienced in complex class actions. Plaintiff has no interests antagonistic to those of the Class and Defendant has no defenses unique to Plaintiff. Moreover, Plaintiff's counsel are well-respected members of the legal community, have regularly engaged in major complex litigation, and have had extensive experience in consumer class actions involving issues of similar size, scope, and complexity as the present case.

50. **Typicality**: Plaintiff's claims are typical of the claims of other members of the Class in that Plaintiff and the members of the Class sustained damages and losses arising out of Defendant's wrongful conduct.

51. **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

(a)     Whether Defendant's Casino is a  "gambling device" as defined by ILCS 5/28-2(a);

(b)     Whether Plaintiff and the Class lost money gambling at Defendant's Casino;

(c)     Whether Defendant's conduct violates the Illinois Consumer Fraud and Deceptive Business Practices Act**,** 815 ILCS §§ 505/1, *et seq.*; and,

(d)      Whether Defendant has been unjustly enriched.

52.     **Policies Generally Applicable to the Class:** This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies that Plaintiff challenges apply and affect members of the Class uniformly, and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff. The factual and legal bases of Defendant's liability to Plaintiff and to the other members of the Class are the same.

53.     **Superiority**: This case is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The harm suffered by the individual members of the Class is likely to have been relatively small compared to the burden and expense of prosecuting individual actions to redress Defendant's wrongful conduct. Absent a class action, it would be difficult if not impossible for the individual members of the Class to obtain effective relief from Defendant. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a

class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured

54.     Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

## COUNT I
### The Illinois Loss Recovery Statute
### (720 ILCS 5/28-8(a))
### (On behalf of Plaintiff and the Class)

55.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

56.     Plaintiff, members of the Class, and Defendant are each a "person" within the meaning of 720 ILCS 5/28-8(a).

57.     Defendant's Casino is a gambling device as defined by 720 ILCS 5/28-2(a) because Defendant created software (the game downloaded onto smartphones and tablets) that must be in constant connection with its servers (that house the algorithms, award prizes, and balance accounts) that together act as a device for the reception of money or another thing of value based on chance in which money and other things of value are bet and lost. As described in Section II, above, Defendant designed the Casino whereby consumers exchange cash for Chips (or cash for Gold and then Gold for Chips) to wager on the outcome of a spin. The Game of War Casino is an electronic version of the popular "wheel of fortune" gaming device (also known as

"big six"[21]) found in traditional casinos.

58.     Defendant's Gold and Chips are things of value because Machine Zone offers them for sale in its electronic Gold Store, and/or are things of value that can be traded for money or other things of value because consumers can buy and sell Game of War accounts on secondary markets. *See* Section II.C.

59.     Defendant's Casino is a game of chance because upon a "spin" it awards things of value based upon pre-determined odds of winning. Defendant programmed its Casino so that players press the "spin" button and an animation causes a selector box to move around the device, and when the selector box stops the consumer is awarded a prize of varying degrees of value. Importantly, after a consumer presses the "spin" button, Defendant does not accept or require any input from consumers to award a prize. The outcome of the spin is determined entirely by chance and not by any action or skill on the part of the consumer. As such, Defendant's Game of War Casino is not a contest of skill.

60.     Plaintiff and each member of the Class are "losers" because they each purchased and then wagered Chips for each spin (approximately $0.60 for a spin) and, on the whole, had the total of their wagers exceed the value of the prizes they received. In addition, Plaintiff and the members of the Class had the value of their wager deducted from their accounts concurrently with a spin and accounted for the prize that was received. As such, Defendant has records sufficient to identify players who, on the whole, received less value in prizes than their wagers (*i.e.*, those that suffered a loss). In total, Plaintiff and each member of the Class have suffered net

---

[21]     *BIG SIX: A LONGITUDINAL MICRO-STUDY*, http://gaming.unlv.edu/reports/big6_study.pdf (last visited Oct. 9, 2015) (stating that "There are several variations of Big Six, a table game also known as the 'Wheel of Fortune' (it has no relation to the [] slot franchise branded after the popular game show of the same name).")

losses of $50 or more by performing spins where they were, in sum, awarded prizes with a total value less than the cost of their wagers.

61.     Defendant is a "winner" because it participates in the games of chance and has a direct stake in the outcome of the gambling. Specifically, Defendant developed the Game of War, programmed the Casino functionality, including the algorithm that determines the chance of winning prizes of value, provides access to the Casino, and obtains all of the money that people lose by spinning and receiving less than their initial wager.

62.     Plaintiff and the members of the Class delivered Chips and money to Defendant through the Game of War mobile game. That is, Defendant authored an electronic method of converting money to Chips and programmed Game of War to deduct Chips (which were purchased with cash) from Plaintiff's and the members of the Class's accounts concurrently with a spin.

63.     Plaintiff and each member of the Class's losses occurred in Illinois because Defendant caused its Game of War mobile application to be installed on smartphones and tablets within the state of Illinois. As such, the Game of War mobile application caused such smartphones and tablets in Illinois to operate as discrete terminals for Defendant's gambling devices (*i.e.*, the Casino).

64.     As a direct and proximate result of Defendant's operation of the gambling device, Plaintiff and each member of the Class have suffered net losses of $50 or more. Plaintiff, on behalf of himself and the Class, seeks an order (1) requiring Defendant to cease the operation of its gambling device; and/or (2) awarding the recovery of all lost monies, interest, and reasonable attorneys' fees, expenses, and costs to the extent allowable.

<u>COUNT II</u>
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**(815 ILCS §§ 505/1, *et seq.*)**
**(On behalf of Plaintiff and the Class)**

65.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

66.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") (815 ILCS §§ 505/1, *et seq.*) protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

67.     The ICFA prohibits any unlawful, unfair, or fraudulent business acts or practices including the employment of any deception, fraud, false pretense, false promise, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact.

68.     The ICFA applies to Defendant's actions and conduct as described herein because it protects consumers in transactions that are intended to result, or which have resulted, in the sale of goods or services.

69.     Defendant is a "person" as defined under section 505/1(c) of the ICFA.

70.     Plaintiff and each member of the Class are "consumers" as defined under section 505/1(e) of the ICFA.

71.     Defendant's in-game items are "merchandise" within the meaning of section 505/1(b) and the sale of the Gold and Chips is considered "trade" or "commerce" under the ICFA.

72.     Defendant's practices, as described above (including Defendant's operation of the Casino and inducement of consumers to purchase Chips for use at the unlawful game of chance), were unfair within the meaning of the act because they offended Illinois' public policy against unlawful and unregulated gambling and were otherwise unethical, oppressive and unscrupulous

and caused substantial injury to the consumers who purchased Chips for use in the Casino.

73.     Defendant caused substantial injury to consumers by inducing them to purchase in-game items, such as Gold, Chips, power-ups, and resources by and through the design of its Game of War mobile game and its Casino. The injury caused by Defendant's conduct is not outweighed by any countervailing benefits to consumers or competition, and the injury is one that consumers themselves could not reasonably have avoided.

74.     Defendant further caused substantial injury to consumers by inducing them to gamble purchased Chips at its Game of War Casino. The injury caused by Defendant's conduct is not outweighed by any countervailing benefits to consumers or competition, and the injury is one that consumers themselves could not reasonably have avoided.

75.     Defendant's unfair practices occurred during the marketing and sale of its in-game items (*e.g.*, Gold, Chips, power-ups, and resources), and therefore, occurred in the course of trade and commerce.

76.     Plaintiff and members of the Class downloaded Game of War, purchased in-game items (*e.g.*, Gold, Chips, power-ups, and resources) under the reasonable belief that the game was lawful, which formed the basis of their bargains. As such, Plaintiff and members of the Class did not receive the benefit of their bargain because Defendant incorporates and generates profits from an unlawful game of chance and induces consumers to unlawfully gamble within the Game of War mobile game.

77.     As a direct and proximate result of Defendant's violation of the ICFA, Plaintiff and each Class member has suffered harm in the form of monies paid for Defendant's in-game items (*e.g.*, Gold, Chips, power-ups, and resources). Plaintiff, on behalf of himself and the Class, seeks an order (1) requiring Defendant to cease the unfair practices described herein; (2)

awarding damages, interest, and reasonable attorneys' fees, expenses, and costs to the extent

allowable; and/or (3) requiring Defendant to restore to Plaintiff and each Class member any

money acquired by means of unfair practices (restitution).

### COUNT III
### Unjust Enrichment
### (On Behalf of Plaintiff and the Class)

78.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth

herein.

79.     Plaintiff and the Class have conferred a benefit upon Defendant in the form of the

money Defendant received from them for the purchase of in-game items (*e.g.*, Gold, Chips,

power-ups, and resources).

80.     Defendant appreciates and/or has knowledge of the benefits conferred upon it by

Plaintiff and the Class.

81.     Under principles of equity and good conscience, and under Illinois law,

Defendant should not be permitted to retain the money obtained from Plaintiff and the members

of the Class, which Defendant has unjustly obtained as a result of its operation of the Game of

War mobile game that incorporates an unlawful game of chance. As it stands, Defendant has

retained millions of dollars in profits generated from its operation of the Game of War mobile

game that incorporates an unlawful game of chance and should not be permitted to retain those

ill-gotten profits.

82.     Plaintiff and members of the Class downloaded Game of War and purchased in-

game items (*e.g.*, Gold, Chips, power-ups, and resources) under the reasonable belief that the

game was lawful, which formed the basis of their bargain. Because the Game of War mobile

game incorporates and profits from an unlawful game of chance, Plaintiff and members of the

Class did not receive the benefits of their bargains.

83.     Accordingly, Plaintiff and the Class seek full disgorgement and restitution of any money Defendant has retained as a result of the unlawful and/or wrongful conduct alleged herein.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Mihajlo Ristic, on behalf of himself and members of the Class, prays that the Court:

a.     Certify this case as a class action on behalf of the Class as defined above and appoint Mihajlo Ristic as Class representative and his undersigned attorneys as Class Counsel;

b.     Enter judgment against Defendant, in the amount of the losses suffered by Plaintiff and each member of the Class;

c.     Award Plaintiff's and the Class's damages and/or require Defendant to restore to Plaintiff and each Class member any money acquired by means of unlawful and unfair competition (restitution);

d.     Enter judgment against Defendant for monetary, actual, consequential, and compensatory damages caused by its unfair conduct;

e.     Award Plaintiff and the members of the Class reasonable costs and attorneys' fees;

f.     Award Plaintiff and the members of the Class pre- and post-judgment interest;

g.     Enter judgment for injunctive, statutory and/or declaratory relief as is necessary to protect the interests of Plaintiff and the members of the Class; and

h.     Award such other and further relief as equity and justice may require.

**JURY DEMAND**

Plaintiff requests trial by jury of all claims that can be so tried.

Respectfully Submitted,

**MIHAJLO RISTIC**, individually and on behalf of all others similarly situated,

Dated: October 9, 2015

By: /s/ Amir C. Missaghi
One of Plaintiff's Attorneys

Rafey S. Balabanian
rbalabanian@edelson.com
Benjamin H. Richman
brichman@edelson.com
Courtney C. Booth
cbooth@edelson.com
Amir C. Missaghi
amissaghi@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378
Firm I.D.: 44146