**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| MIHAJLO RISTIC, individually, and on behalf of all others similarly situated, | Case No. 15-cv-8996 |
| *Plaintiff*, | The Honorable Robert M. Dow, Jr. |
| *v.* | |
| MACHINE ZONE, INC., a Delaware corporation, | |
| *Defendant*. | |

**FIRST AMENDED CLASS ACTION COMPLAINT AND**
**DEMAND FOR JURY TRIAL**

Plaintiff Mihajlo Ristic brings this First Amended Class Action Complaint against Defendant Machine Zone, Inc. ("Machine Zone" or "Defendant") to recover gambling losses and damages incurred through the operation of its electronic casino. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and upon information and belief, including investigation conducted by his attorneys, as to all other matters.

**NATURE OF THE ACTION**

1. Defendant Machine Zone operates the popular Game of War videogame, which is available on Android and Apple iOS smartphones and tablets. Players download the game onto their smartphones and tablets, create virtual towns and armies, and battle other Game of War players.

2. While the game is free to play, Machine Zone sells "Gold" and "Chips" within the game, starting at the price of $4.99 for 1,200 Gold. While players can use Gold to improve their virtual towns and hasten their advancement in the game, these benign uses of Gold merely

obfuscate the unlawful game of chance Machine Zone operates within Game of War. In this game of chance—appropriately named the "Casino"—players routinely wager hundreds of dollars for the chance of winning valuable prizes.

3.     Unfortunately, thousands of consumers across the Illinois have lost—and Defendant has won—millions of dollars through Defendant's Game of War Casino. Accordingly, Plaintiff Mihajlo Ristic, on his own behalf and on behalf of a class and subclass of similarly situated individuals, brings this lawsuit to recover the ill-gotten gains, damages, and losses, where applicable, as well as costs and attorneys' fees.

## PARTIES

4.     Plaintiff Mihajlo Ristic is a natural person and citizen of the State of Illinois.

5.     Defendant Machine Zone, Inc. is a corporation existing under the laws of the State of Delaware, with its principal place of business located at 555 Hamilton Avenue, Palo Alto, California 94301. Machine Zone conducts business in this District, the State of Illinois, and nationwide.

## JURISDICTION AND VENUE

6.     Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the class is a citizen of a state different from Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under that subsection apply to this action.

7.     The Court has personal jurisdiction over Defendant because Defendant conducts significant business transactions in this District, and because the wrongful conduct occurred in and emanated from this District.

8.     Venue is proper because Defendant conducts business transactions in this District,

the causes of action at issue arose in substantial part in this District, and Plaintiff resides in this District.

## COMMON FACTUAL ALLEGATIONS

### I.     Free-to-Play and the New Era of Gambling.

9.      The proliferation of internet-connected smartphones and tablets has led to the growth of so-called "free-to-play" videogames. With free-to-play games, developers encourage consumers to download and play games for free while selling many low-cost items within the game itself. Developers aim to recoup their costs (and make a profit) by selling thousands of "in-game" items that start at $0.99 (purchases known as "micro-transactions") instead of charging an up-front fee.

10.      The free-to-play model has become particularly attractive to developers of games of chance (*e.g.,* poker, blackjack, and slot machine mobile videogames, among others) because it allows them to generate huge profits. In 2012, free-to-play games of chance generated over $1.6 billion in worldwide revenue and are expected to grow to over $2.4 billion by the end of 2015.[1] Even "large land-based casino operators are looking at this new space" for "a healthy growth potential."[2]

11.      With free-to-play games of chance, developers have begun exploiting the same psychological triggers as casino operators. As one respected videogame publication put it:

"If you hand someone a closed box full of promised goodies, many will happily pay you for the crowbar to crack it open. The tremendous power of small random packs of goodies has long been known to the creators of physical collectible card

---

[1]      VentureBeat, *Report confirms that social casino games have hit the jackpot with $1.6B in revenue | GamesBeat | Games | by Dean Takahashi,* http://venturebeat.com/2012/09/11/report-confirms-that-social-casino-games-have-hit-the-jackpot-with-1-6b-in-revenue/ (last visited Oct. 9, 2015).

[2]      *Id.*

3

games and companies that made football stickers a decade ago. For some . . . the allure of a closed box full of goodies is too powerful to resist. Whatever the worth of the randomised [sic] prizes inside, the offer of a free chest and the option to buy a key will make a small fortune out of these personalities. For those that like to gamble, these crates often offer a small chance of an ultra-rare item."[3]

12.     Another stated:

"Games may influence 'feelings of pleasure and reward,' but this is an addiction to the games themselves; micro-transactions play to a different kind of addiction that has existed long before video games existed, more specifically, an addiction similar to that which you could develop in casinos and betting shops."[4]

13.     The comparison to casinos doesn't end there. Just as with casino operators, free-to-play developers rely on a small portion of their players to provide the majority of their profits. These "whales," as they're known in casino parlance, account for just "0.15% of players" but provide "over 50% of mobile game revenue."[5]

14.     Game Informer, another respected videogame magazine, reported on the rise (and danger) of micro-transactions in free-to-play games and concluded:

"[M]any new mobile and social titles target small, susceptible populations for large percentages of their revenue. If ninety-five people all play a [free-to-play] game without spending money, but five people each pour $100 or more in to obtain virtual currency, the designer can break even. These five individuals are what the industry calls whales, and we tend not to be too concerned with how they're being used in the equation. While the scale and potential financial ruin is of a different magnitude, a similar profitability model governs casino gambling."[6]

15.     Academics have also studied the socioeconomic effect free-to-play games have on consumers. In one study, the authors compiled several sources analyzing free-to-play games of

---

[3]     PC Gamer, *Microtransactions: the good, the bad and the ugly*, www.pcgamer.com/microtransactions-the-good-the-bad-and-the-ugly/ (last visited Jan. 8, 2016).

[4]     The Badger, *Are micro-transactions ruining video games? | The Badger*, www.badgeronline.co.uk/micro-transactions-ruining-video-games/ (last visited Jan. 8, 2016).

[5]     *Id.* (emphasis added).

[6]     Game Informer, *How Microtransactions Are Bad For Gaming - Features - www.GameInformer.com*, www.gameinformer.com/b/features/archive/2012/09/12/how-microtransactions-are-bad-for-gaming.aspx (last visited Jan. 8, 2016).

4

chance (called "casino" games below) and stated that:

> "[Researchers] found that [free-to-play] casino gamers share many similar sociodemographic characteristics (*e.g.*, employment, education, income) with online gamblers. Given these similarities, it is perhaps not surprising that a strong predictor of online gambling is engagement in [free-to-play] casino games. Putting a dark line under these findings, over half (58.3%) of disordered gamblers who were seeking treatment stated that social casino games were their first experiences with gambling."
>
> . . .
>
> "According to [another study], the purchase of virtual credits or virtual items makes the activity of [free-to-play] casino gaming more similar to gambling. Thus, micro-transactions may be a crucial predictor in the migration to online gambling, as these players have now crossed a line by paying to engage in these activities. Although, [sic] only 1–5% of [free-to-play] casino gamers make micro-transactions, those who purchase virtual credits spend an average of $78. Despite the limited numbers of social casino gamers purchasing virtual credits, revenues from micro-transactions account for 60 % [sic] of all [free-to-play] casino gaming revenue. Thus, a significant amount of revenue is based on players' desire to purchase virtual credits above and beyond what is provided to the player in seed credits."[7]

16.     The same authors looked at the link between playing free-to-play games of chance and gambling in casinos. They stated that, "[prior] research indicated that winning large sums of virtual credits on social casino gaming sites was a key reason for [consumers'] migration to online gambling," yet the largest predictor that a consumer will transition to online gambling was "micro-transaction engagement." In fact, "the odds of migration to online gambling were approximately *eight times greater* among people who made micro-transactions on [free-to-play] casino games compared to [free-to-play] casino gamers who did not make micro-transactions."[8]

17.     The similarity between free-to-play games of chance and games of chance found

---

[7]     Hyoun S. Kim, Michael J. A. Wohl, *et al.*, *Do Social Casino Gamers Migrate to Online Gambling? An Assessment of Migration Rate and Potential Predictors*, Journal of gambling studies / co-sponsored by the National Council on Problem Gambling and Institute for the Study of Gambling and Commercial Gaming (Nov. 14, 2014), *available at* http://link.springer.com/content/pdf/10.1007%2Fs10899-014-9511-0.pdf (citations omitted).

[8]     *Id.* (emphasis added).

in casinos has caused governments across the world to intervene and limit their availability.[9] For example, a member of the Belgian Gaming Commission recently decried Game of War's Casino as illegal gambling, stating that Machine Zone was targeting underage consumers and encouraging them to gamble due to the "casino elements" within the game.[10]

18.     As it relates to online gambling more generally, the Illinois Attorney General recently found that the operation of websites that allow individuals to play games of chance for a thing of value is illegal under Illinois gambling statutes.[11]

## II.     Defendant's Game of War and its Virtual Casino.

19.     Machine Zone operates the popular Game of War videogame that is available on Android (*e.g.*, Samsung Galaxy S) and iOS (*e.g.*, Apple iPhone) smartphones and tablets. Consumers download the game for free by visiting the Google Play or the Apple App store. Once the game is installed, consumers begin playing by opening the game and running through a tutorial created by Machine Zone aimed to familiarize consumers with the game's mechanics.

20.     Although the game is free-to-play, one of the primary methods by which Defendant generates revenue is selling in-game "Gold" to consumers. Prices start at $4.99 for 1,200 Gold. Since early 2014, Machine Zone has generated over $600 million in revenue, in

---

[9]     In late August 2014, South Korea began regulating "social gambling" games, including games similar to Game of War, by "ban[ning] all financial transactions directed" to the games. PokerNews.com, *Korea Shuts Down All Facebook Games In Attempt To Regulate Social Gambling | PokerNews*, www.pokernews.com/news/2014/09/korea-shuts-down-facebook-games-19204.htm (last visited Jan. 8, 2016). Similarly, "the Maltese Lotteries and Gambling Authority (LGA) invited the national Parliament to regulate all digital games with prizes by the end of 2014." *Id.*

[10]     *Belgian Regulator Denounces Game of War: Fire Age as "Illegal Gambling"*, www.casino.org/news/belgian-regulator-denounces-game-war-fire-age-illegal-gambling (last visited Jan. 8, 2015).

[11]     SPORTS AND GAMING: Daily Fantasy Sports Contests as Gambling, Illinois Attorney General Opinion 15-006, available at http://www.ag.state.il.us/opinions/2015/15-006.pdf (Dec. 23, 2015).

large part, by selling Gold.

21.     With the in-game currency of Gold, players are able to buy all sorts of "Items" that assist them in advancing in the game. For example, players can buy "resources" such as stone or silver, special items such as "Winged Boots" or "Pegasus Wing," or certain forms of game assistance such as speeding up various timers. (See <u>Figures 1–4</u>.)



(**Figure 1.**)



(**Figure 2.**)



(**Figure 3.**)



(**Figure 4.**)

22.     Each of these items costs a certain amount of Gold. As the figures above show, for example, 10,000 Stone costs 40 Gold, a pair of Winged Boots costs 500 Gold, and a 3-Day Speed Up costs 4,400 Gold. And because Gold is purchased with real-world currency, and these items are then purchased with Gold, items in the game have a real-world dollar value.

23.     Another thing that consumers are able to purchase with Gold, however, is "Chips" to use at the game's "Casino." Defendant's aptly named Casino, though, is nothing more than an illegal game of chance camouflaged as a benign videogame.

    A.    *Defendant's Game of War Casino and its Spinning Wheel of Chance.*

24.     Within Game of War, Machine Zone has created a virtual Casino where the only purpose is to engage in a game of chance. The first time consumers visit the Casino, Defendant gives them a free "spin" of the wheel. (*See* Figure 5.)

8



(**Figure 5.**)

25.     After their initial visit, consumers have to wager a minimum of 5,000 Chips for each spin. If consumers do not have enough Chips to spin the Wheel, Machine Zone informs them that they must "Get & Use" Chips by buying them for 200 Gold. (*See* Figure 6.) Defendant then directs consumers to its "Gold Store to purchase more" via a pop-up screen. (*Id.*)

 

(**Figure 6.**)

26.     At its Gold Store, Defendant sells Gold at prices starting at $4.99 for 1,200 Gold

and at a maximum of $99.99 for 20,000 Gold.[12] (*See, e.g.,* <u>Figure 7</u>.)



(**Figure 7.**)

27.     Once the consumers have purchased the Gold, they can return to the Casino to exchange their Gold for Chips to use at Defendant's game of chance.

28.     Defendant's Casino is not unlike the popular spinning wheel games found at traditional casinos (*e.g.*, "Big Six Wheel" or "Wheel of Fortune"). For its version of the spinning wheel, Defendant encourages consumers to "PLAY" by wagering 5,000 Chips (approximately $0.60) to spin the wheel. (*See* <u>Figure 8</u>, showing the cost of one "PLAY" or spin as 5,000 Chips, or $0.60). Defendant also developed a "HIGH ROLLER MODE" that can be activated (at a price) to increase the wager while making "bonus items" available as prizes.

---

[12]     To boost sales of Chips and Gold (and without disclosing this fact), Defendant only lets players purchase packages at prices equal to or higher than the price of the previous package the consumer purchased. For example, if a consumer purchased packages at $4.99, then $4.99, and then $9.99, Defendant won't offer the consumer a package less than $9.99 going forward.


(**Figure 8.**)


(**Figure 9.**)

29.     When the consumer spins the wheel, Defendant uses an animated light to indicate a "spin." The animated light then rotates around the wheel and stops after several seconds. The consumer is awarded whatever prize the animated light lands on. (*See* Figure 9, showing that the player won "10,000" additional Chips, worth approximately $1.20—or the value of two "spins".)

30.     The prizes Defendant awards vary in value from "resources" that can be used to advance game play, such as "food," "wood," or "stone," (which are worth less than the initial wager) to high-value items such as additional Casino Chips or Gold (which are worth more than the initial wager).

31.     In Figure 10, the player landed on a "treasure chest," which requires the player to pick one of three chests with hidden prizes (or buy access to all three for several thousand gold). There, the player won 440 Gold, worth $1.83, and had the chance of winning 8,800 Gold, worth $36.59.



(**Figure 10.**)[13]

32.     In other words, every time a consumer spins the wheel, he or she must make a wager valued at $0.60 (or 5,000 Chips). Upon spinning, consumers have the ability to win items worth less than the $0.60 spin—including small amounts of wood, food, and power-ups—or more than the $0.60 spin—including additional Chips, high-end power-ups, and large amounts of other items, such as food.

33.     Many of the items consumers may win upon spinning the wheel have a demonstrated value—created by Defendant—because they can also be purchased in Defendant's "Items" store as described above. Figure 11 identifies the real-world value of a number of these prizes:

---

[13]     *Game of War - Casino High Roller – YouTube*, https://www.youtube.com/watch?v=M92TPtvju6I (last visited Jan. 8, 2016).

| | |
|---|---|
| 10,000 Food* | $ 0.055 |
| 6,000 Ore | $ 0.100 |
| 6,000 Stone | $ 0.010 |
| 6,000 Wood | $ 0.010 |
| 500 Silver* | $ 0.277 |
| 15 Minute Speed Up | $ 0.291 |
| 60 Minute Speed Up | $ 0.540 |
| 10,000 Chips | $ 1.188 |
| 8 Hour Speed Up* | $ 2.703 |
| 2,000,000 Food* | $ 11.089 |
| 3 Day Speed Up* | $ 18.297 |
| 8,800 Gold* | $ 36.593 |

(**Figure 11**, showing prizes available in the Casino. An asterisk denotes prizes awarded through a "treasure chest.")[14]

34.     As items highlighted in red in Figure 11 show, certain prizes awarded in the Casino are worth less than the initial spin of $0.60 (or 5,000 Chips). Conversely, Defendant programmed the Casino to sometimes award prizes of greater value than the spin of $0.60 (or 5,000 Chips). Those awards, highlighted in green in Figure 11, range from $1.18 for 10,000 Chips (double the initial spin) to $36.59 for 8,800 Gold.Similar to traditional spinning wheels found in casinos, consumers do not have any ability to control what prizes Defendant awards upon a spin.[15] After pressing the button to spin the wheel, Defendant does not accept any input or action until it awards the prize—no skill on the part of the consumer affects the outcome of a

---

[14]     *Game of War:Fire Age Let's Play Ep.30:110k Casino Chips+More Gold+Questions+More Shoutout's! – YouTube*, https://www.youtube.com/watch?v=f-x-2qSv04Q (last visited Jan. 8, 2015) (showing prizes won upon landing on the Treasure Chest and selecting one of three chests.).

[15]     While the consumer does not have a choice as to the specific prize they are awarded by the spinning wheel, there are instances where Defendant's prize is a play at another game of chance. In those cases, for example, Defendant will present three closed "treasure chests" to the consumer that contain (hidden) items of varying value. The consumer is allowed to open one chest to discover and keep whatever it contains. Like the spinning wheel, the contents of the chests range from in-game resources to additional Chips or Gold.

spin. In fact, while other segments of the Game of War videogame do require a certain level of skill, the Casino is a separate and unnecessary component found within the game—not unlike a slot machine found in a billiards hall. That is, the existence and proximity of games of skill do not cure the gambling nature of games of chance. Moreover, should Machine Zone stop operating the Casino, the remaining portions of the Game of War videogame would continue on without consequence.

35.     The outcome of a spin depends entirely on the rules Defendant has programmed into the Game of War Casino. Defendant programmed the rules that determine, for example, how much consumers can wager, how the wagers are deducted from accounts, how long each spin takes, how the spin is animated, the odds of winning each type of prize, and how the prize is presented and credited to the consumer. Moreover, Defendant maintains detailed records showing transaction details, such as when players purchase Gold and/or convert Gold to Chips.

C.     *Consumers Have Lost (and Defendant Has Won) Real Money in the Casino.*

36.     The Casino accounts for a substantial share of the revenue generated by Game of War. Defendant advertises the Casino to consumers within the game and has tied usage of the Casino to in-game advancement. By design, all players of Game of War have undoubtedly spun the wheel at the Casino. And once Defendant has gotten a consumer's foot in the Casino door, Defendant does its best to encourage consumers to wager Chips that have been purchased with cash.

37.     In one report, a child who played Game of War lost over €25,000 (approximately $27,000) of his parents' money by playing Game of War and wagering at the Casino.[16]

38.     The allure of the Casino, naturally, is that consumers have the chance of winning

---

[16]     *Belgian Regulator Denounces Game of War: Fire Age as "Illegal Gambling"*, *supra*.

prizes that are valued higher than their initial wagers. Knowing this, Defendant populated the possible outcomes with prizes such as Chips that grant additional spins of the wheel and "treasure chests" that might be filled with Gold.

39. In an effort to uncover the odds of winning various prizes, an individual that regularly plays in the Casino compiled the results of over 1,000 individual spins. These results, shown in Figure 12, shed light on the odds Defendant programmed each spin to win each prize.

|  | Spins | Basic Items | Chests | Chests With Gold | Free Chips |
|---|---|---|---|---|---|
| Total Spins | 1098 | 843 | 178 | 47 | 77 |
| Total Percent | 100% | 76.78% | 16.21% | 26.40% | 7.01% |

(**Figure 12.**)[17]

40. As the figures above show, Defendant programmed the odds to favor the award of "basic items" on a spin while disfavoring the award of chests, Gold, and Chips. Nevertheless, under this model, Defendant risks awarding out more than the $0.60 a consumer pays on each spin. Yet, Defendant programmed the odds in that way because it knows that consumers will pay a little money up front for the *chance* at receiving an otherwise expensive item. By design, then, Defendant has made millions selling Chips and Gold that are used to wager at its Casino.

D. *The Secondary Market for Game of War Accounts.*

41. Players have created secondary markets to buy and sell Game of War accounts. For example, Game of War accounts are regularly listed for sale on traditional auction websites, such as nonparty eBay, Inc., for $500 or more. Accounts containing a high amount of Gold and

---

[17] *What are the odd's - Casino | GOWFA Central*, www.gowfacentral.com/what-are-the-odds-casino/ (last visited Jan. 8, 2016).

Chips fetch higher prices.[18]

42.     Similarly, players routinely list accounts for sale at PlayerAuctions.com where the prices rise commensurate with the amount of Gold in the account, with some listed for $3,000 and more.[19] As such, players' account values will increase with the amount of Gold that is won through Defendant's Casino.

43.     Thousands of players have also joined together to create a Facebook community that is self-described as the "Largest Game of War Account Trading Community on Facebook. Here you can Buy, Sell, and Trade GoW Accounts."[20]

44.     And on www.PlayerUp.com—the "worlds [*sic*] most secure player 2 player account marketplace"—over 5,070 users have listed their Game of War accounts for sale. (*See* Figure 13.) Many of the consumers selling accounts have asked prices well over $1,000. (*See id.*)

45.     Defendant is and was fully aware of the existence of this secondary market and the manner in which its customers use it.

\*               \*               \*

---

[18]     *Game of war accounts | eBay*, www.ebay.com/sch/i.html?_from=R40&_trksid= p2050601.m570.l1313.TR0.TRC0.H0.Xgame+of+war+accounts.TRS0&_nkw=game+of+war+a ccounts&ghostText=&_sacat=0 (last visited Jan. 8, 2016).
[19]     *Buy Game of War Account with Mil power and lot more offer! | PlayerAuctions*, www.playerauctions.com/game-of-war-account/ (last visited Jan. 8, 2016).
[20]     *Game of War Accounts - Buy and Sell | Facebook*, www.facebook.com/ gameofwaraccounts (last visited Jan. 8, 2016).



(**Figure 13.**)

## PLAINTIFF RISTIC'S EXPERIENCE

46.     In early 2014, Plaintiff Ristic downloaded Game of War onto his smartphone and began playing the game. Soon after, he began playing in the Casino where he wagered complimentary Chips for a chance to win a prize.

47.     After he exhausted his complimentary Chips, Plaintiff Ristic began purchasing more Chips by buying Gold in increments of at least $4.99. Thereafter, Plaintiff Ristic continued to purchase Chips and Gold so that he could wager Chips for a chance at winning prizes in Defendant's Casino.

48.     In total, between April 9, 2015 and October 9, 2015, when Plaintiff originally filed the instant action, he lost more than $50 wagering at Defendant's Casino, likely exceeding $500.[21]

---

[21]     While it is clear that Plaintiff lost more than $50 during this time and likely more than $500, Plaintiff is unable to determine the exact amount lost on each date due to the mechanics of

## CLASS ALLEGATIONS

49.     **Class Definitions:** Plaintiff brings this action pursuant to Federal Rules of Civil

Procedure 23(b)(2) and 23(b)(3) on behalf of himself and a Class and Subclass defined as

follows:

> <u>Class</u>: All persons domiciled in the State of Illinois who paid any amount of
> money to wager in Defendant's Game of War Casino.

> <u>Subclass:</u> All members of the Class who lost $50 or more gambling at
> Defendant's Game of War Casino.

The following persons are excluded from the Class: (1) any Judge or Magistrate presiding

over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents,

successors, predecessors, and any entity in which the Defendant or its parents have a controlling

interest and their current or former employees, officers and directors; (3) persons who properly

execute and file a timely request for exclusion from the Class; (4) persons whose claims in this

matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel

and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any

such excluded persons.

50.     **Numerosity:** On information and belief, tens of thousands of consumers fall into

the Class definition. Members of the Class can be identified through Defendant's records.

51.     **Adequate Representation:** Plaintiff will fairly and adequately represent and

protect the interests of the members of the Class, and he has retained counsel competent and

experienced in complex class actions. Plaintiff has no interests antagonistic to those of the Class

---

the Casino and the information available through the application. *See* redacted statement of
purchases attached hereto as Exhibit A, showing "Game of War – Fire Age" purchases exceeding
$500 on August 17, 2015. Defendant maintains all records necessary to determine the dates and
amounts lost with specificity.

and Defendant has no defenses unique to Plaintiff. Moreover, Plaintiff's counsel are well-respected members of the legal community, have regularly engaged in major complex litigation, and have had extensive experience in consumer class actions involving issues of similar size, scope, and complexity as the present case.

52.     **Typicality**: Plaintiff's claims are typical of the claims of other members of the Class in that Plaintiff and the members of the Class sustained damages and losses arising out of Defendant's wrongful conduct.

53.     **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

    (a)     Whether Defendant knowingly established, maintains, or operates an Internet site that permits a person to play a game of chance over the Internet;

    (b)     Whether the items won and lost at Defendant's Casino constitute "thing[s] of value" under Illinois law; and

    (c)     Whether Defendant's conduct violates the Illinois Consumer Fraud and Deceptive Business Practices Act**,** 815 ILCS §§ 505/1, *et seq*.

54.     **Policies Generally Applicable to the Class:** This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies that Plaintiff challenges

apply and affect members of the Class uniformly, and Plaintiff's challenge to these policies

hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law

applicable only to Plaintiff. The factual and legal bases of Defendant's liability to Plaintiff and to

the other members of the Class are the same.

55.      **Superiority**: This case is also appropriate for certification because class

proceedings are superior to all other available methods for the fair and efficient adjudication of

this controversy. The harm suffered by the individual members of the Class is likely to have been

relatively small compared to the burden and expense of prosecuting individual actions to redress

Defendant's wrongful conduct. Absent a class action, it would be difficult if not impossible for

the individual members of the Class to obtain effective relief from Defendant. Even if members

of the Class themselves could sustain such individual litigation, it would not be preferable to a

class action because individual litigation would increase the delay and expense to all parties and

the Court and require duplicative consideration of the legal and factual issues presented. By

contrast, a class action presents far fewer management difficulties and provides the benefits of

single adjudication, economy of scale, and comprehensive supervision by a single Court.

Economies of time, effort, and expense will be fostered and uniformity of decisions will be

ensured

56.      Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class

Definitions" based on facts learned through additional investigation and in discovery.

**COUNT I**
**The Illinois Loss Recovery Statute**
**(720 ILCS 5/28-8(a))**
**(On behalf of Plaintiff and the Subclass)**

57.      Plaintiff incorporates by reference the foregoing allegations as if fully set forth

herein.

58.     Plaintiff, members of the Subclass, and Defendant are each a "person" within the meaning of 720 ILCS 5/28-8(a).

59.     Defendant knowingly established, maintains, and operates the Game of War Casino, which permits consumers to play a game of chance for money or other things of value by means of the Internet.

60.     Plaintiff and the members of the Subclass lost money, or other things of value, worth more than $50 to Defendant through playing its game of chance. Defendant's Casino is a game of chance because upon a "spin" it awards things of value based upon pre-determined odds of winning. Defendant programmed its Casino so that players press the "spin" button and an animation causes a selector box to move around the device, and when the selector box stops the consumer is awarded a prize of varying degrees of value. Importantly, after a consumer presses the "spin" button, Defendant does not accept or require any input from consumers to award a prize. The outcome of the spin is determined entirely by chance and not by any action or skill on the part of the consumer.

61.     Plaintiff and the members of the Subclass lost money because they used it to purchase Gold and Chips to wager in the Casino (like casino-goers purchase credits to use on slot machines in traditional casinos), which they lost to Defendant through wagering.

62.     Plaintiff and the members of the Subclass also lost things of value, namely Gold and Chips, to Defendant by playing in its game of chance. The Gold and Chips are things of value because (i) Machine Zone sells packages of them in its virtual store for prices beginning at $4.99 and $0.83, respectively, and (ii) because they can be sold or traded for money or other things of value on secondary markets. *See* Section II.C.

63.     Plaintiff and each member of the Subclass lost money and other things of value

because the total of their wagers exceed the value of the prizes they received by at least $50. In addition, Plaintiff and the members of the Subclass had the value of their wager deducted from their accounts concurrently with each spin. As such, Defendant has records sufficient to identify players who suffered a loss in this manner. Simply put, Plaintiff and each member of the Subclass have suffered net losses of $50 or more by performing spins where they were awarded prizes with a total value less than the cost of their wagers.

64.     Defendant won Plaintiff's and the Subclass members' money and things of value because it participates in the games of chance and has a direct stake in the outcome of the gambling. Specifically, Defendant developed Game of War, programmed the Casino's functionality, including the algorithm that determines the chance of winning prizes of value, provides access to the Casino, and obtains all of the money that people lose by spinning and receiving a prize valued at less than their wager. As the sole operator of the game of chance and only other participant in the wager, there are no other competitors to whom Plaintiff and the Subclass members could have wagered against or lost their money.

65.     Additionally, though unnecessary to establish a claim under the Illinois Loss Recovery Statute, Defendant's Casino is a gambling device as defined by 720 ILCS 5/28-2(a) because it accepts money or other things of value from consumers for wagering in a game of chance. Defendant both created and updates the software (the game downloaded onto smartphones and tablets) and maintains the servers (that house the algorithms, award prizes, and balance accounts) that combined constitute an illegal gambling device. The application downloaded on consumers' phones is the user interface through which consumers must insert their money (through payment by credit card) to make their wagers. And once consumers make wagers and perform a spin, Machine Zone automatically and concurrently deducts the purchased

Chips from consumers' accounts. In the end, much like traditional casinos with slot machines, Machine Zone receives the benefits of each wager lost by consumers through the virtual game of chance housed in its Casino.

66.     Plaintiff and each member of the Subclass's losses occurred in Illinois because Defendant caused its Game of War mobile application to be installed on smartphones and tablets within the state of Illinois. As such, the Game of War mobile application caused such smartphones and tablets in Illinois to operate as discrete terminals to interface with Defendant's gambling device (*i.e.*, the Casino).

67.     As a direct and proximate result of Defendant's operation of the gambling device, Plaintiff and each member of the Subclass have suffered net losses of $50 or more. Plaintiff, on behalf of himself and the Subclass, seeks an order (1) requiring Defendant to cease its gambling operations; and/or (2) awarding the recovery of all lost monies, interest, and reasonable attorneys' fees, expenses, and costs to the extent allowable.

**COUNT II**
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**(815 ILCS §§ 505/1, *et seq.*)**
**(On behalf of Plaintiff and the Class)**

68.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

69.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") (815 ILCS §§ 505/1, *et seq.*) protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

70.     The ICFA prohibits any unlawful, unfair, or fraudulent business acts or practices including the employment of any deception, fraud, false pretense, false promise, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact.

71.     The ICFA applies to Defendant's actions and conduct as described herein because it protects consumers in transactions that are intended to result, or which have resulted, in the sale of goods or services.

72.     Defendant is a "person" as defined under section 505/1(c) of the ICFA.

73.     Plaintiff and each member of the Class are "consumers" as defined under section 505/1(e) of the ICFA.

74.     Defendant's in-game items are "merchandise" within the meaning of section 505/1(b) and the sale of the Gold and Chips is considered "trade" or "commerce" under the ICFA.

75.     By operating Game of War, Defendant violates Illinois's gambling statues by, *inter alia*, establishing, maintaining, and operating the Game of War mobile application, which allows individuals to play games of chance over the Internet for the opportunity to win things of value.

76.     Defendant's Casino is a game of chance because upon a "spin" it awards things of value based upon pre-determined odds of winning. Defendant programmed its Casino so that players press the "spin" button and an animation causes a selector box to move around the device, and when the selector box stops the consumer is awarded a prize of varying degrees of value. Importantly, after a consumer presses the "spin" button, Defendant does not accept or require any input from consumers to award a prize. The outcome of the spin is determined entirely by chance and not by any action or skill on the part of the consumer.

77.     By playing Defendant's game of chance, consumers have the opportunity to win things of value. More specifically, upon wagering for a spin valued at $0.60, individuals may win numerous items, including, *inter alia*, Chips, Gold, wood, food, and power-ups. These items

have established values—ranging from $0.055 to $36.59 (*see* <u>Figure 11</u>)—and are even sold by Defendant in its in-application stores.

78.     Defendant's operation of, and profit from, the Game of War application is an unfair business practice prohibited by the ICFA because it violates Illinois's gambling statutes and, therefore, offends public policy.

79.     The Illinois legislature enacted the gambling statutes to stymie illegal gambling for profit, and Defendant's business of operating and profiting from the Game of War mobile application directly defies the policy behind the gambling statutes and is oppressive to individuals the statutes were enacted to protect.

80.     In particular, free-to-play, game-of-chance mobile applications, like Game of War, exploit the same psychological triggers as typical brick-and-mortar casino operators by offering individuals the chance to win a random prize. These are the very same triggers that may spark a need to wager or lead to the development of a gambling addiction.

81.     However, unlike traditional casinos, Defendant allows—and solicits—individuals (including minors) to make wagers wherever they have mobile devices and mask the benign game of chance with Chips, Gold, and other in-game prizes.

82.     Moreover, when individuals do not have enough virtual currency to make the minimum wager, they cannot simply purchase Gold in the amount necessary to make the minimum bet like individuals in traditional casinos could. Instead, Defendant forces consumers to purchase Gold packages in quantities greater than or equal to their previous purchase—i.e., forcing consumers to purchase an amount of Gold that far exceeds the amount required for a single spin.

83.     By engaging in such conduct, Defendant preys on consumers and profits from the

same psychological triggers utilized by traditional casinos that influence individuals to make wagers and that individuals addicted to gambling regularly suffer from.

84.     Defendant's established business of operating the Game of War mobile application is oppressive, unscrupulous, and causes individuals substantial injury in the form of money spent to purchase the virtual currency. Indeed, not only has Plaintiff Ristic spent more than $50 (and in excess of $500) to purchase virtual currency for use in wagering, but other consumers have spent tens of thousands of dollars.

85.     The injuries caused by Defendant's conduct are not outweighed by any countervailing benefits to consumers or competition. Additionally, they are not injuries that consumers themselves could reasonably have avoided given Defendant's use of psychological triggers that prompt regular consumers, as well as addicts, to continue wagering for the chance to win something of great value.

86.     Defendant's unfair practices occurred during the marketing and sale of its in-game items (*e.g.*, Gold, Chips, power-ups, and resources), and therefore, occurred in the course of trade and commerce.

87.     As a direct and proximate result of Defendant's violation of the ICFA, Plaintiff and each Class member has suffered harm in the form of monies paid for Defendant's in-game items (*e.g.*, Gold, Chips, power-ups, and resources). Plaintiff, on behalf of himself and the Class, seeks an order (1) requiring Defendant to cease the unfair practices described herein; (2) awarding damages, interest, and reasonable attorneys' fees, expenses, and costs to the extent allowable; and/or (3) requiring Defendant to restore to Plaintiff and each Class member any money acquired by means of unfair practices (restitution).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Mihajlo Ristic, on behalf of himself and members of the Class, prays that the Court:

a.      Certify this case as a class action on behalf of the Class and Subclass as defined above and appoint Mihajlo Ristic as Class representative and his undersigned attorneys as Class Counsel;

b.      Enter judgment against Defendant in the amount of the losses suffered by Plaintiff and each member of the Class and Subclass;

c.      Award Plaintiff's and the Class's and Subclass's damages and/or require Defendant to restore to Plaintiff and each Class and Subclass member any money acquired by means of unlawful and unfair competition (restitution);

d.      Enter judgment against Defendant for monetary, actual, consequential, and compensatory damages caused by its unfair conduct;

e.      Award Plaintiff and the members of the Class and Subclass reasonable costs and attorneys' fees;

f.      Award Plaintiff and the members of the Class and Subclass pre- and post-judgment interest;

g.      Enter judgment for injunctive, statutory and/or declaratory relief as is necessary to protect the interests of Plaintiff and the members of the Class and Subclass; and

h.      Award such other and further relief as equity and justice may require.

## JURY DEMAND

Plaintiff requests trial by jury of all claims that can be so tried.

Respectfully Submitted,

**MIHAJLO RISTIC**, individually and on behalf of all others similarly situated,

Dated: January 8, 2016
By: /s/ Benjamin H. Richman
    One of Plaintiff's Attorneys

Rafey S. Balabanian
rbalabanian@edelson.com
EDELSON PC
329 Bryant Street
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

Benjamin H. Richman
brichman@edelson.com
Courtney C. Booth
cbooth@edelson.com
Amir C. Missaghi
amissaghi@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

<u>**CERTIFICATE OF SERVICE**</u>

I, Benjamin H. Richman, an attorney, hereby certify that on January 8, 2016, I served the above and foregoing ***First Amended Class Action Complaint and Demand for Jury Trial***, by causing true and accurate copies of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system.

<u>/s/ Benjamin H. Richman</u>